UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MANUEL G. HOOKER                          CIVIL ACTION

VERSUS                                    NUMBER: 10-1624

LYNN COOPER                               SECTION: "S"(5)

### SUPERCEDING REPORT AND RECOMMENDATION

### BACKGROUND

On January 4, 2011, the undersigned magistrate judge issued a report and recommendation (rec. doc. 11) recommending that this matter, a petition for federal habeas corpus relief filed by Manuel Hooker, be dismissed with prejudice as untimely.  In issuing its report and recommendation, the court did not consider the arguments raised in Hooker's "Rebuttal to State's Memorandum and Answer to Petitioner's Writ of Habeas Corpus" (rec. doc. 10).  Pursuant to the district court's remand (rec. doc. 13), the court issues the instant superceding report and recommendation.[1]

---

[1]Because this is superceding report and recommendation, rather than a supplemental report and recommendation, the court will provide information, such as Hooker's procedural history, which was included in its original report and recommendation.

**PROCEDURAL HISTORY**

Petitioner Hooker is a state prisoner who is currently incarcerated at the Avoyelles Correctional Center, Cottonport, Louisiana. On June 18, 2001, the State filed a bill of information charging Manual Hooker with attempted second degree murder.[2] On April 24, 2002, a twelve-member jury in Orleans Parish Criminal District Court found Manuel Hooker guilty of the responsive verdict of attempted manslaughter. Thereafter, the State filed a multiple bill charging Manual Hooker as a second felony offender. On April 25, 2003, the trial judge found Manual Hooker to be a multiple offender and sentenced him to serve thirty years at hard labor. On June 2, 2004, Hooker's conviction and sentence were affirmed on direct appeal to the Louisiana Fourth Circuit Court of Appeal. State v. Hooker, 874 So.2d 439 (Table), No. 2003-KA-2060 (La. App. 5th Cir. 2004).[3] Writs were denied by the Louisiana Supreme Court on December 10, 2004. State v. Hooker, 888 So.2d 836 (La. 2004).

On June 4, 2006, Hooker filed a post-conviction relief application with the Orleans Parish Criminal District Court, setting forth as his sole claim for relief that he received

---

[2]Lewis Hooker, a cousin and co-defendant, was charged with Manuel Hooker but found to be not guilty at trial.

[3]A copy of the Fourth Circuit's unpublished opinion is contained in the State rec., vol. 4 of 6.

ineffective assistance of counsel.[4] When Hooker received no ruling on that application, he filed a "Petition for Writ of Mandamus" with the Louisiana Fourth Circuit Court of Appeal.[5] Broadly construing Hooker's pleading as an application for a supervisory writ, the Louisiana Fourth Circuit, on November 19, 2007, denied Hooker's writ. State v. Hooker, No. 2007-K-1329 (La. App. 4 Cir. 11/19/07) (unpublished opinion).[6] Specifically, the state appellate court provided: "Relator's claim in his application for post-conviction relief has been reviewed. Relator has failed to demonstrate prejudice or that counsel's performance was so deficient as to deny him a fair trial." Id. The court further provided, in light of its adjudication on the merits of Hooker's post-conviction application, that his "writ of mandamus is denied." Id. In connection with the Louisiana Fourth Circuit's November 19, 2007 adverse opinion, Hooker sought relief from the Louisiana Supreme Court.[7] On November 14, 2008, the Louisiana Supreme Court

---

[4]A copy of Hooker's post-conviction application is contained in the State rec., vol. 5 of 6.

[5]A copy of Hooker's writ of mandamus is contained in the State rec., vol. 5 of 6.

[6]A copy of the state appellate court's unpublished opinion is contained in the State rec., vol. 5 of 6.

[7]A copy of Hooker's Petition for Certiorari and Review is contained in the State rec., vol. 6 of 6.

denied Hooker's writ application.   <u>State ex rel. Hooker v. State</u>, 996 So.2d 1085 (La. 2008).

On May 4, 2010, Hooker filed the instant action for federal habeas corpus relief.[8]   In his federal habeas petition, Hooker raises as his sole claim for relief the same claim he raised in connection with his state post-conviction proceedings, namely, that he received ineffective assistance of counsel.

**FACTS**[9]

At trial Officer Roland Doucette testified that about 10:30 a.m. on April 17, 2001, he investigated a shooting that occurred between Orleans Avenue, North Galvez and St. Ann Streets.   When he arrived on the scene a woman told him that a man involved in the incident was on a porch on Orleans Avenue.   Shortly thereafter the officer saw a man leaving a porch and walking toward the lake on

---

[8]This May 4, 2010 filing date was ascertained via the court's use of the "mailbox rule".   Under this rule, a pleading filed by a prisoner acting <u>pro</u> <u>se</u> is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court.   <u>Cooper v. Brookshire</u>, 70 F.3d 377, 379 (5th Cir. 1995). Generally, the date a prisoner signs his petition is presumed to be the date he delivered it to prison officials for mailing.   <u>See</u> <u>Colarte v. Leblanc</u>, 40 F.Supp.2d 816, 817 (E.D. La. 1999).   May 4, 2010 represents the date Hooker signed his "Affidavit of Verification" which accompanied his federal habeas corpus petition.

[9]The facts were ascertained from the Louisiana Fourth Circuit's unpublished opinion, <u>State v. Hooker</u>, No. 2003-KA-2060.

Orleans Avenue.  The officer called to him, asking him to stop; however, the man took his white shirt off and began running. Officer Doucette radioed a description, and another officer apprehended the man.

Officer Edgar Barrett and his partner, Officer Derrick Williams, were on pro-active patrol on April 17, 2001, driving in tandem in separate cars when Officer Barrett heard gunshots.  He immediately called in other police units and quarantined the block. While he was patrolling the block, the officer saw a man dressed in black hiding in a grassy field. As soon as he was stopped, the man, later identified as Lewis Hooker, stated that he was not the gunman but was only "buying weed" in the area.  He gave the officer the location of the marijuana, and the officer retrieved it.

Detective Gerard Robinette testified that when he arrived at North Galvez Street and Orleans Avenue he found a man unconscious on the ground; that man was later identified as Alvin White.  The detective stayed with the man until the emergency medical unit came for him.

Felicia Dannel testified that she knew the two defendants only from the neighborhood and not personally.  She knew Manuel Hooker as Jabar.  She recalled that on April 17, 2001, a friend introduced her to Alvin White.  Later that morning an argument occurred between Alvin White and Jabar.  She saw them leaving the area, and

then she heard gunshots.  While at her home, she looked towards Orleans Avenue and North Galvez Street where she saw Manuel Hooker standing over Alvin White with a gun and then she saw Hooker running from the scene.  A police car arrived there almost immediately.  The next time she saw the defendant, he was handcuffed and in a police car.  Ms. Dannel went to Central Lockup where she identified Manuel and Lewis Hooker and named them as the men she had seen shooting at Alvin White and fleeing the area. Under cross-examination, Ms. Dannel admitted that at a hearing in August she had lied when she said that she was at a relative's house on St. Ann Street when she heard gunshots.[10]  She explained the discrepancy saying that she had been threatened many times for her willingness to testify, and she was frightened when she testified in August.  She maintained that she was telling the truth at trial.

Mr. Frank Petta, a paramedic with the New Orleans ambulance service, testified that he was called to the intersection of Orleans Avenue and North Galvez Street on April 17 about 10:30 a.m. where he found a man with two gunshot wounds.  The man, who was no longer responsive, was taken to Charity Hospital.

---

[10]The relative's house was farther from the shooting and outside the police tape; Ms. Daneel's house was within the police tape.

Mr. Alvin White testified that he recognized Manuel Hooker as the man who shot at him on April 17th when he was visiting friends at a house on the corner of St. Ann and North Galvez Streets.  As he was leaving that house, he was talking on his cell phone. Manuel and Lewis Hooker had just passed by him when Manuel Hooker turned around and began shooting.  Mr. White began running towards Orleans Avenue; he was hit twice and fell to the ground.  At Charity Hospital, Mr. White was in a coma for about three months and had more than twenty operations.  He had his spleen and most of his intestines removed.  At one time during his recovery, he weighed eighty pounds.  When Mr. White was shown a photo lineup, he selected Manuel Hooker's picture and named him as the man who shot him.  Under cross-examination, Mr. White admitted he had a 1995 conviction for simple robbery.

Detective Derrick Williams, who was assigned to patrol in the area, testified that he was within a block of the gunfire that day. He first saw Mr. White running from the corner of St. Ann Street; his shirt was bloody.  The detective got out of his car and saw Manuel Hooker holding a handgun and chasing Mr. White.  Lewis Hooker was also chasing Mr. White.   The detective knew Manuel Hooker from previous stops in the neighborhood.  When the defendant saw the officer, he turned and ran the other way.  Detective Williams called in additional units and set up a perimeter around

the immediate area.   One of the other officers apprehended Lewis Hooker.   A canine unit found Manuel Hooker under a house in the area.   As the detective was attempting to put Manuel Hooker into his police car, Mr. Hooker kicked the officer and fled.   He was apprehended in a hallway in the Iberville Development.

Officer Thomas Kennedy of the New Orleans Crime Lab testified that he investigated the scene and found a holster and pistol in a vacant lot of the 2200 block of St. Ann Street.   No fingerprints were found on the items.   He also found one spent casing at the intersection of St. Ann and North Galvez Streets.   Sergeant Byron Winbush, a firearms and ballistics examiner for the New Orleans Crime Lab, testified that he examined the spent casing and the pistol and found that the cartridge case was fired from the pistol found in the vacant lot.

Manuel Jabar Hooker began his testimony by admitting that he had two prior convictions for possession of a concealed weapon, one from 1994 and one from the past year.   He explained that because he is a drug dealer he needed to carry a gun.   However, he denied ever shooting anyone.   On April 17, 2001, Mr. Hooker was on the corner of North Galvez Street and Orleans Avenue when his cousin, Lewis, came by.   Lewis had purchased marijuana and was on his way to a nearby store to buy a cigar.   A man, whom Mr. Hooker presumed to be Kenny Mutin, asked him for heroin, but when Mr. Hooker retrieved

8

it, that man robbed him of twenty bags of heroin.  Alvin White, who had appeared behind Mutin, pulled out a gun and participated in the robbery.  There was a fight for the gun and in the course of the altercation it fired, injuring Mr. White.  Mr. Hooker, who picked up the gun, explained that he was running after Alvin White because he was angry.  He also said he tried to elude the police because he did not think they would believe his explanation of events.

Lewis Hooker, a high school student, testified that he was in the neighborhood to buy marijuana.  After buying it, he spoke with his cousin Manuel and then went to the store.  As he was leaving the store, he heard gunshots.  Then he saw Alvin White run by, and behind him was Manuel Hooker carrying a gun.  The police were there instantly, and Lewis began running because he had marijuana on his person.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact

9

are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2).  <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §2254(d)(1).  The United States Supreme Court has noted:

> §2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams[ v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."  28 U.S.C. §2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

**ANALYSIS**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.No. 104-132, 110 Stat. 1214 (1996)(effective April 24, 1996) generally requires that a petitioner bring his Section 2254 claims within one year of the date on which his underlying criminal judgment becomes "final."  Under the AEDPA, a judgment is considered final upon the expiration of time for seeking direct review.  28 U.S.C. §2244(d)(1)(A).

As noted above, the Louisiana Supreme Court denied Hooker's writ application on direct review on December 10, 2004.  Therefore, Hooker's conviction became final 90 days later, on March 10, 2005, when the delays for seeking a writ of certiorari from the United States Supreme Court expired and no application therefor was made.  See U.S. Sup.Ct. R. 13(1); Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999), cert. denied, 529 U.S. 1099, 120 S.Ct. 1834 (2000)(citing 28 U.S.C. §2244(d)(1)(A)).  Accordingly, Hooker's one-year period for seeking federal habeas corpus relief commenced on that date and, under normal circumstances, would have expired on March 10, 2006.  However, as Hooker notes in his rebuttal (rec. doc. 10, p. 2), circumstances were far from normal during a portion of the above

11

time period, March 10, 2005 to March 10, 2006, as a result of
Hurricane Katrina.  In light of that fact, it has been established
that the AEDPA's one-year limitations period, with respect to
habeas corpus petitions filed in the United States District Court
for the Eastern District of Louisiana, was tolled during the 86-day
period from September 1, 2005 through November 25, 2005.  See Mark
v. Michael, 2008 WL 4365929, *2 (E.D. La. 9/23/08); Bartley v.
Louisiana Dept. Of Corrections, 2009 WL 2872932, *3 (E.D. La.
9/2/09); MacCracken v. Louisiana, 2008 WL 2951214, *7 n. 47 (E.D.
La. 7/25/08).[11]  By virtue of this 86-day tolling period, Hooker's
limitation period would have expired on June 4, 2006, unless it was
further extended by tolling.

---

[11]The decisions in Mark, Bartley, and MacCracken are based
upon a September 1, 2005 Order issued by then-Chief Judge of the
United States District Court for the Eastern District of
Louisiana, Helen G. Berrigan.  Specifically, Judge Berrigan
ordered:

> Due to Hurricane Katrina and its aftermath, and the
> direct consequences of evacuation, the disruption of
> services and communication in the region, and the
> Courthouse in New Orleans, as well as numerous
> attorneys's offices, being temporarily inaccessible,
>     IT IS HEREBY ORDERED that all deadlines and
> delays, including liberative prescriptive and
> peremptive periods in cases pending or to be filed in
> this court, are hereby suspended until ordered
> otherwise.

On November 3, 2005, Chief Judge Berrigan ordered that the
suspension was "terminated effective November 25, 2005, except
for good cause shown as determined by the presiding judge."

12

Under 28 U.S.C. §2244(d)(2), the time during which a petitioner has a properly filed application for post-conviction relief or other collateral review pending before the state courts is not counted against the one-year limitation period. Hooker filed an application for post-conviction relief with the Orleans Parish Criminal District Court on June 4, 2006, the very date his statute of limitations was set to expire. Hooker asserts that his post-conviction application has remained pending and, therefore, has continued to interrupt prescription, because the Orleans Parish Criminal District Court has never ruled upon his post-conviction application, specifically, his claim that he received ineffective assistance of counsel. While Hooker acknowledges the fact that the Louisiana Fourth Circuit Court of Appeal reviewed his ineffectiveness claim, determining that "relator has failed to demonstrate prejudice or [that] counsel's performance was so deficient as to deny him a fair trial" (rec. doc. 10, p. 3), he asserts that the state appellate court lacked authority to issue a ruling on the merits. Hooker argues that even if the above "comment" on the part of the Louisiana Fourth Circuit "is misconstrued . . . to stand as its ruling, the ruling denied petitioner his right to due process of law, because it's procedurally incorrect." (Rec. doc. 10, p. 3).

The above argument is without merit for the following reasons.

13

First, a review of the procedural history associated with several federal habeas cases reflects that it is not uncommon for the Louisiana Fourth Circuit, in the interest of judicial economy, to consider the underlying merits of post-conviction claims in instances where the Orleans Parish Criminal District Court failed to issue a ruling.  See, e.g., Smith v. Cain, Civil Action No. 07-1504, 2007 WL 2461663, *1 (E.D. La. 08/23/07); Forman v. Cain, Civil Action No. 07-4200, 2008 WL 1746710, *1 (E.D. La. 04/14/08); Lewis v. Cain, Civil Action No. 09-2848, 2009 WL 3367055, *1 (E.D. La. 10/16/09); Duggars v. Wilkinson, Civil Action No. 05-0241, 2006 WL 3533073, *2 (E.D. La. 12/07/06).  In none of the above-cited cases was the determination made that the Fourth Circuit's adjudication on the merits was "procedurally incorrect" because the post-conviction application was inappropriately considered pursuant to a writ of mandamus, absent a ruling on the part of the Orleans Parish Criminal District Court.[12]

Second, a challenge to the Louisiana Fourth's Circuit's

---

[12]In one of the above cases, Lewis, 2009 WL 3367055 at *1, the Louisiana Fourth Circuit Court of Appeal, in adjudicating petitioner's post-conviction application on the merits via his "Petition for a Supervisory Writ of Mandamus", employed language very similar to the language used by the state appellate court in the instant matter.  Specifically, the Louisiana Fourth Circuit provided:  "Relator's claims in his application for post-conviction relief have been reviewed.  Relator has failed to demonstrate that he is entitled to relief.  The request for a writ of mandamus is denied."  Id. (Footnote omitted).

authority to issue a ruling on the merits of a post-conviction application via a writ of mandamus has previously been raised and has been rejected.   Baham v. Allen Correctional Center, Civil Action No. 07-4075, 2009 WL 3148757, *2 (E.D. La. 09/30/09), involved a situation where petitioner, Kirk Baham, having failed to receive a ruling from the Orleans Parish Criminal District Court in connection with his post-conviction application, "filed with the Louisiana Fourth Circuit Court of Appeal a petition for a writ of mandamus claiming that he was being denied access to the courts by the failure of the state district court to rule on his post-conviction application."   In relief, Baham "requested that the district court be ordered to act on his application."   Id. Instead, however, "the Court of Appeal construed the petition as an application for supervisory review and simply denied petitioner's underlying post-conviction claims on the merits."   Id. Dissatisfied with the appellate court's ruling, Baham filed a writ application with the Louisiana Supreme Court arguing "that the Louisiana Fourth Circuit Court of Appeal erred in assuming jurisdiction over his post-conviction application and denying his claims on the merits."   Id.   The Louisiana Supreme Court denied Baham's writ application without assigning reasons.   State ex rel. Baham v. State, 957 So.2d 169 (La. 2007).

In his federal habeas petition, Baham again argued that the

15

Louisiana Fourth Circuit Court of Appeal lacked the authority to rule on the merits of his substantive post-conviction claims. According to Baham, the state appellate court properly should have remanded the matter to the state district court where his post-conviction application should properly still be pending.

In rejecting the above argument, the <u>Baham</u> court first noted that the action taken by the Louisiana Fourth Circuit in addressing the merits of Baham's post-conviction claims via his writ of mandamus was not uncommon. The Louisiana Fourth Circuit, "in the interest of judicial economy," routinely takes such action. <u>Baham</u>, 2009 WL 3148757 at *3.

The court further noted that whether or not the appellate court's action in addressing the merits of Baham's claims was procedurally incorrect was "an issue of state law" and the state's highest court had rejected the notion by rejecting Baham's writ application wherein he had argued that a ruling on the merits by the Orleans Parish Criminal District Court was required. <u>Id</u>. <u>See also</u> <u>Forman</u>, 2008 WL 1746710 at *1 n.5 (Whether the state appellate court's action in ruling on the merits "was appropriate is a determination better left to the state courts interpreting the state's own rules, and the Louisiana Supreme Court rejected petitioner's writ application challenging the Court of Appeal's action.")

As the petitioner did in <u>Baham</u>, Hooker, in his writ application to the Louisiana Supreme Court, challenged the appropriateness of the state appellate court's action in ruling on the merits of his post-conviction application in the absence of a ruling by the state district court. Specifically, Hooker argued: "Instead of issuing an order for the criminal district court to act, the appellate court determined that the trial court had already acted and determined that petitioner was not entitled to relief on its own accord and that petitioner did not demonstrate prejudice." (Petition for Certiorari and Review, p. 4).[13] The Louisiana Supreme Court, however, rejected the above argument, denying Hooker's writ application. <u>State ex rel. Hooker v. State</u>, 996 So.2d 1085 (La. 2008).

It is not the province of a federal court, on habeas review, to secondguess state courts on state law matters. See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>see also Dickerson v. Guste</u>, 932 F.2d 1142, 1145 (5th Cir.1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law.")(internal citation and quotation marks omitted). Accordingly, it is not for this

---

[13]A copy of Hooker's Petition for Certiorari and Review is contained in the State rec., vol. 6 of 6.

17

court to find that the Louisiana Fourth Circuit overstepped its authority by ruling on the merits of Hooker's post-conviction application and, therefore, his application is still pending. In the absence of such a finding, Hooker's one-year statute of limitations ceased to be tolled on November 18, 2008, when the Louisiana Supreme Court denied his writ application. As Hooker did not file the instant habeas petition until May 4, 2010, his petition is clearly time-barred absent a basis for equitably tolling Hooker's prescriptive period.

Equitable tolling is justified only in "'rare and exceptional circumstances.'" Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir.1999), quoting Davis v. Johnson, 158 F.3d 806 (5th Cir1998), cert. denied, 526 U.S. 1074, 119 S.Ct. 1474, 143 L.Ed.2d 558 (1999). It "applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir.1999), citing Rashidi v. American President Lines, 96 F.3d 124, 128 (5th Cir.1996). The evidence must show that the applicant, though deterred by matters outside his or her control, was nevertheless diligent in his or her pursuit of §2254 relief. Coleman, 184 F.3d at 403.

In this case, Hooker has presented no facts which would

warrant the application of equitable tolling.  Accordingly, Hooker's habeas application should be dismissed as untimely under §2244(d).

Alternatively, Hooker's habeas petition is subject to dismissal because it is without merit.  Hooker raises as his sole claim for relief that he received ineffective assistance of counsel.

The seminal Supreme Court decision regarding ineffective assistance of counsel is <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984), wherein the Court held that in order to prove that counsel was ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the <u>Strickland</u> test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (citing <u>Strickland</u>, 466 U.S. at 690).  To prove prejudice under the <u>Strickland</u> standard, petitioner "must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Hooker informs that on October 2, 2001, his counsel, Michael Idoyaga, moved to withdraw from the case due to Hooker's failure to provide compensation. (Rec. doc. 1, memorandum in support of petition for writ of habeas corpus, p. 12). When Hooker attempted to offer an explanation to the trial court as to why the court may need to appoint new counsel, he "was cut short" and advised if he could not reach an agreement with Mr. Idoyaga by October 9, 2001, the court would "have to appoint someone to represent [him]". (Rec. doc. 1, supporting memorandum, pp. 12 and 13). Thereafter, during an October 9, 2001 status hearing at which Hooker was not present, the representation issue was deemed "satisfied". (Rec. doc. 1, supporting memorandum, p. 13). On February 26, 2002, when Hooker "was scheduled to appear before the trial court", Idoyaga visited him in a holding cell and informed that the trial court had appointed Idoyaga to represent him. Idoyaga further informed of the "necessity of funds to pursue the investigation needed in petitioner's case." (Rec. doc. 1, supporting memorandum, p. 13).

Though unclear, Hooker appears to insinuate that based upon the above, Idoyaga's representation may have been tainted by virtue of a conflict of interest. However, in the absence of some

20

specifics regarding what counsel did or did not due as a result of any resentment or conflict counsel may have had based upon the above-described problems associated with his representation, Hooker has clearly failed to meet his burden of proof under Strickland.

Hooker has likewise failed to meet his burden of proof in connection with his claim that counsel failed to "pursue the investigation needed in petitioner's case." Specifically, Hooker complains that counsel "failed to perform any pre-trial investigation" even though Hooker "informed [counsel] of the fabricated testimony of Mr. White [the victim]" and even though there was "suspicion of the weapon found at the scene". (Rec. doc. 1, supporting memorandum, p. 14).

While Hooker complains that his counsel failed to investigate the victim's version of events, he fails to specify what his counsel failed to do. Hooker fails to identify witnesses who were not interviewed and fails to set forth what steps counsel should have taken or what type of investigation counsel could have performed to impeach Alvin White's version of events. Accordingly, Hooker has failed to satisfy his burden of proof under Strickland.

With regard to Hooker's claim of ineffectiveness in connection with "suspicion of the weapon found at the scene", once again, Hooker fails to specify what counsel failed to do. Further, Hooker

21

fails to specify what alleged "suspicion" was associated with the weapon.

A review of the state's opposition to Hooker's complaint reflects the state's belief that the "suspicion" to which Hooker alludes arose from the testimony of New Orleans Police Officer Thomas Kennedy. On direct examination, Officer Kennedy stated that the "magazine" of the gun he recovered at the crime scene "held ten rounds and the eleventh round was in the chamber of the gun ready to be fired."[14]   However, in response to defense counsel's questioning on cross-examination, Officer Kennedy stated that the "magazine cylinder capacity" for the recovered gun was "ten shot."[15] Thus, if the gun was recovered with ten rounds in its magazine and ten rounds is the "magazine cylinder capacity" for this particular gun, Hooker argues that this gun could not have been used to fire two bullets into the victim.

The significance of the above testimony and resulting "suspicion" is substantially undermined given that the State offered no testimony directly linking the recovered gun to the two shots fired into the victim. New Orleans Police Sergeant Byron

---

[14]State rec., vol. 3 of 6, p. 222, lines 23-24

[15]State rec., vol. 3 of 6, p. 228, lines 2-5.

22

Winbush, a ballistics expert,[16] testified that his test firing of the recovered gun and subsequent cartridge case comparison proved that the "cartridge case that was recovered from the scene was in fact fired from this weapon."[17] However, no bullets were recovered from the victim and, as such, Winbush's testimony did not directly establish that the recovered gun was the one used to shoot the victim. His testimony was merely circumstantial evidence which, when taken with the identification of Hooker by other witnesses, was sufficient for the jury to reach its verdict of guilty in this matter.

Based upon the above, the court finds that Hooker has failed to satisfy his burden of proof. Specifically, Hooker has failed to specify what investigation counsel should have undertaken to develop or exploit the alleged "suspicion" surrounding the recovered gun and failed to show how he was prejudiced by counsel's failure to undertake such an investigation. Accordingly;

## RECOMMENDATION

---

[16]State rec., vol. 3 of 6, p. 231, lines 17-22.

[17]State rec., vol. 3 of 6, p. 235, lines 14-32; p. 236, line 1.  Winbush explained that while the "magazine cylinder capacity" for the recovered gun was ten rounds, there was actually "enough room" in the magazine for twelve rounds, along with an additional round in the gun's chamber. State rec., vol. 3 of 6, p. 238, lines 17-28.

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of Manuel Hooker be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc).[18]

New Orleans, Louisiana, this 23rd day of ____February____, 2011.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

_____

[18]Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.